## Case No. 13,501.

### STOUGHTON et al. v. HILL.

[3 Woods, 404.] 1

Circuit Court, S. D. Georgia. April Term, 1877.

DOMICILE — ENEMY — AGENT — DEPRECIATED CURRENCY—LAWFUL MONEY.

1. A domicile once acquired is presumed to continue.. But this presumption ·does not prevail when its effect would be to impose upon the party the character of an enemy to his government.

2. An agent, unless expressly authorized, cannot bind his principal by receiving in satisfaction of a note held by him for collection a greatly depreciated currency which is not a legal tender.

3. By a note of hand, made in Georgia, February 16, 1859, and due January 1, 1860, the

·1 [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

payment of a certain number of dollars was promised. *Held*, that the word "dollars," as used in the note, meant dollars in lawful money of the United States.

[This was a bill in equity by Stoughton & Peck against B. Hill.] Heard upon pleadings and evidence for final decree. The facts are stated in the opinion of the court.

A. W. Stone and A. Sloan, for complainants.
B. Hill. in pro. per.

ERSKINE, District Judge. The bill alleges that the plaintiffs are the owners and holders of a promissory note, purchased by them in due course of trade, before it became due, and of which the following is a copy: "Macon, Ga., February 16, 1859. On the first of January, 1860, we promise to pay the Macon & Brunswick Railroad Company, or bearer, five hundred dollars. Value received. (Signed) Stubbs & Hill." And that, not being paid at maturity, they, on the 8th of January, 1860, placed it with Poe, Grier & Poe, attorneys at law, for collection. That this firm was subsequently dissolved, and the note remained with W. Poe for collection. That the defendant Hill, surviving partner of Stubbs & Hill, the makers, combined to defraud the plaintiffs, with one Daniells, receiver of the so-called Confederate States,—who had got the note from said Poe, as the property of alien enemies, for sequestration,—and obtained possession of it without payment of the same, or any part thereof, which fact has just come to the knowledge of the plaintiffs. That it is still in his possession, unless he has lost or destroyed it, and they ask that he be decreed to pay it, according to its tenor and effect. Hill answered the bill, and he and said Poe responded to certain interrogatories. It may be here remarked that the allegation of fraud charged against Hill has not been established. On the contrary, the evidence shows that he got possession of the note in a business-like manner, and not otherwise. And if he received it from Poe—for there is no evidence that he received it from Daniells—under a mistake of his legal liability, it is his misfortune; nothing more. Hill states that Stubbs, in signing the note in the name of the firm, went beyond the scope of his authority; that it was given for railroad stock, which soon became worthless, and that he never heard of the note until the latter part of 1859, nor that Poe had it for collection until 1862, when he promised to pay it, and did afterwards, on the 24th of December, 1863, pay it in Confederate treasury notes and state of Georgia treasury notes, and then received it from the hands of Poe, the attorney, who caimed the right to collect it; and that when he paid it he understood that the plaintiffs lived in this state when they traded for it, and supposed that they resided here when he took it up. And as to Daniells, the receiver's connection with the note, Poe says Daniells compelled him to surrender it, as the property of alien enemies, for sequestration by the Confederate court, and that subsequently, on re-

ceiving the Confederate and Georgia treasury notes from Hill, he turned them over to Daniells, who then delivered him the note, and he handed it to Hill; but he does not recollect whether the note had been sequestrated and confiscated or not. Hill says he attached the note to the plaintiffs' interrogatories, and has not seen it since.

Upon a careful perusal of the evidence, I do not think it sustains the position of the defendant, that the plaintiffs had their domicile or fixed residence in Georgia, on the 8th of January, 1860, when they placed the note with the attorneys for collection. But, assuming that it was then their actual residence, still, notwithstanding such fact, no presumption arises as to these plaintiffs (though the contrary was urged), that they continued to dwell here, on the 24th of December, 1863, when Hill got possession of the note, or during any period of the Civil War. It is true that the supreme court declares, in Mitchell v. U. S., 21 Wall. [88 U. S.] 350, that "a domicile once acquired is presumed to continue until it is shown to have been changed." But it seems to me that it would be illogical, if not, indeed, a pernicious straining of the general doctrine of inhabitancy, to infer and determine that these plaintiffs continued to reside here after the war commenced,—a conclusion which, in judgment of law, would impress them with a hostile character to the United States, whether they were adherent to the Rebellion or not.

Again, suppose that they really were residents of this state when they gave the note to the attorneys for collection, and that from the commencement to the termination of the war they resided here or elsewhere within the limits of the Confederate territory, and without conferring any authority upon the attorneys to take, or having any knowledge, until long afterwards, that they had taken payment for it in Confederate States treasury notes and state of Georgia treasury notes,—currencies not in existence until two years subsequent to the date of the note,—and when received at par for it, the relative value of the Confederate States paper, never made a legal tender by their congress, was as twenty, and the state of Georgia paper, which state, at no time, passed any law to compel creditors to receive it, or any in regard to it, that would otherwise impair the obligation of contracts, as fifteen to one of gold, it clearly seems to me that the acceptance of these currencies by the attorneys, under such a state of facts, would not discharge Hill from liability on his note. Be that as it may, the testimony discloses that the note was made on the 16th of February, 1859, and matured on the first of January, 1860; and it is not questioned that the plaintiffs took it for value, and while under due. The term "dollars," as employed in this instrument, means dollars of the lawful money of the United States; and as it was not only executed, but came to maturity before the civil strife began, no extraneous evidence will be permitted to give it a different signification.

No evidence has been adduced to show that the plaintiffs knew of the pretended payment of the note, or of its delivery to Hill until immediately before the institution of this suit, therefore no negligence is imputable to them. Then it is useless to pursue this subject further than to quote the language of the supreme court, by Mr. Justice Field, in Ward v. Smith, 7 Wall. [74 U. S.] 447: "The power of a collecting agent, by the general law, is limited to receiving for the debt of his principal that which the law declares to be a legal tender, or which is, by common consent, considered and treated as money, and passes as such at par, is established by all the authorities. The only condition they impose upon the principal, if anything else is received by his agent, is, that he shall inform the debtor that he refuses to sanction the unauthorized transaction, within a reasonable period after it is brought to his knowledge."

There must be a decree for the plaintiffs, with interest at the rate of seven per cent. per annum on the principal from the first of January, 1860, to the 19th of April, 1861, when the interest shall cease, and commence again on the second of August, 1866, and run to the present time, with costs of suit. See U. S. v. Muhlenbrink [Case No. 15,831].